IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Timothy R. Holmes,                                              Case No. 3:08CV2801

        Plaintiff

    v.                                                       ORDER

Michael J. Astrue,
        Commissioner of Social Security

        Defendant

In this appeal, I review defendant Commissioner of Social Security's (Commissioner) final decision denying plaintiff Timothy R. Holmes's claims for disability insurance benefits (DIB) under Title II of the Social Security Act (SSA), 42 U.S.C. §§ 416(i) and 423. Jurisdiction is proper under 28 U.S.C. § 1331 and 42 U.S.C. § 405(g).

Holmes objects [Doc. 21] to the Magistrate Judge's Report and Recommendation (Magistrate's Report) [Doc. 20] which recommends affirming the administrative law judge's (ALJ) decision. Based on a *de novo* review of the record, I overrule Holmes's objections and adopt the Magistrate's Report.

**Procedural History**

Holmes filed an application for DIB on March 5, 2004, with an alleged disability onset date of November 18, 2003. The Social Security Administration (SSA) denied Holmes's claim both

initially and on reconsideration. ALJ John L. Mondi held a hearing on May 1, 2007, via videoconference, and denied Holmes's application on June 6, 2007.

On September 29, 2008, the SSA Office of Hearing and Appeals denied Holmes's request for review, thereby rendering the ALJ's decision the final judgment of the Commissioner.

Holmes then sought judicial review of the Commissioner's decision. On December 18, 2009, Magistrate Judge Benita Y. Pearson issued a Report and Recommendation recommending I affirm the Commissioner's decision.

## Medical History

Holmes is a high-school-educated individual who previously worked as a window cleaner and vinyl siding installer. He was forty-nine years old at the time of his alleged disability onset, and fifty-three years old at the time of the ALJ's decision.

### I. History Before Disability Claim

Because of pain in his neck, hands, back and joints, Holmes visited numerous physicians, primarily at the referral of his primary care physician, Dr. Brian Miller.

On January 8, 2002, Dr. Carl Herkimer, an orthopedist, examined Holmes based on pain in his cervical spine, upper extremities, hands and feet. Dr. Herkimer noted that x-rays showed degenerative changes at spinal discs C4-5 and a magnetic resonance imaging scan (MRI) showed possible disc protrusion. Dr. Herkimer observed that Holmes had a complete range of motion in both of his shoulders and that his neurological functions were intact. Dr. Herkimer recommended physical therapy and an evaluation by Dr. Brian F. Hoeflinger, a neurosurgeon.

On January 26, 2002, Dr. Hoeflinger examined Holmes and observed that Holmes had moderate discomfort with palpation over the posterior aspect of his neck and shoulders. Dr.

2

Hoeflinger reviewed the MRI and found mild changes in Holmes's cervical spine and mild stenosis, but no evidence of spinal cord compression. Dr. Hoeflinger did not see a problem requiring surgery.

Holmes underwent a whole-body bone scan in February, 2002, which showed he had arthropathy involving both shoulders and his left hand.

Also in February, 2002, Dr. Tom Calderon, a neurologist, examined Holmes. Dr. Calderon observed that Holmes was not taking medication for his physical symptoms, had full muscle strength and walked with a normal gait. Dr. Calderon found a positive Tinel's sign at both wrists, indicative of possible carpal tunnel syndrome. Dr. Calderon opined that Holmes's bone scan suggested osteoarthritis in his first metacarpal phalangeal joint. Dr. Calderon prescribed medications for Holmes's pain and referred him for a trial of cervical steroid injections.

Dr. Martin Skie, a hand specialist, evaluated Holmes for bilateral hand pain in February and June, 2002. Dr. Skie noted basilar thumb grinding and instability and tenderness of the anterior aspect, consistent with right index trigger finger and carpometacarpal arthritis. Holmes discussed surgical options with Dr. Skie, but told Dr. Skie that he was busy with his window cleaning business and elected to proceed conservatively with splinting and over-the-counter medication.

In March, 2002, Holmes visited Dr. William James for hand, shoulder and neck pain. Dr. James noted that Holmes had a minimally reduced range of motion in his neck and shoulders, and that there were no palpable myofascial bands or trigger points identified. Dr. James further observed that Holmes's hand and shoulder joints were tender during the examination. Dr. James noted that Holmes had good grip strength. Dr. James diagnosed Holmes with osteoarthritis of the shoulder and left hand, and cervical spondylosis.

In April, 2002, Dr. Miller referred Holmes for a rheumatology consultation with Dr. Robert I. Finkel. Dr. Finkel observed that Holmes's neck rotation was slightly restricted, and that Holmes had tenderness in the trapezius and scapular areas. Holmes expressed feeling pain in his thumb joints and there were scattered degenerative changes in his distal finger joints. Dr. Finkel opined that he thought Holmes had cervical disc disease with spondylosis and spinal stenosis.

## II. History After Disability Claim

In November, 2003, Holmes saw Dr. David Field, who noted that Holmes had severe degenerative joint disease in his lower cervical spine and severe lumbosacral disc degeneration. He, nonetheless, noted that Holmes appeared capable of all fine motor skills.

In February, 2004, Holmes returned to Dr. James for pain management. Dr. James noted that Holmes had not done anything specific about his pain since visit twenty months earlier. Holmes had good grip strength and intact motor and sensory functions. Holmes's range of motion in his neck was modestly diminished. Dr. James believed Holmes had degenerative spine disease with diffuse myalgias and arthralgias, and recommended an evaluation by a pain psychologist.

In March, 2004, Holmes saw Dr. Glenn Swimmer, a pain psychologist. Dr. Swimmer noted that, based on his limited evaluation, Holmes met the diagnostic criteria for an anxiety disorder.

On May 4, 2004, a state agency physician, Dr. Charles Derrow, reviewed Holmes's medical records at the request of the state Bureau of Disability Determinations. Dr. Derrow stated that Holmes could perform work consistent with the medium exertional level,[1] but that he would be limited in his ability to climb, crawl, stoop, crouch and reach.

---

[1] Medium work is defined as work "involv[ing] lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

4

Dr. Michael Gordon examined Holmes in June, 2004, for joint pain and possible Raynaud's disease. Holmes complained of his fingers being cold, especially in cold weather. Dr. Gordon noted that on examination, both his hands and feet were cool to the touch and his peripheral pulses were decreased in both lower extremities. Holmes had tenderness and degenerative changes in his thumb joints. Dr. Gordon noted Holmes had a full range of motion in all his joints. Follow-up testing showed normal arterial flow to both upper extremities.

A second state agency physician, Dr. Jerry Liepack, reviewed Holmes's medical records in September, 2004. Similarly to Dr. Derrow, Dr. Liepack stated that Holmes could perform work consistent with the medium exertional level, but that he would be limited in his ability to climb, crawl, stoop, crouch and push and pull with upper extremities.

In September, 2005, Holmes saw hand specialist, Dr. Frank C. Hui. Dr. Hui noted that Holmes had tenderness in his elbows, and pain in hands, and in his wrists with motion. He observed that Holmes had a full range of motion. Dr. Hui suggested that Holmes seek a rheumatology and soft-tissue pain.

In October, 2005, Holmes underwent a series of x-rays, which showed mild degenerative changes in the cervical and lumbar spine.

In late 2005 and early 2006 Holmes saw Dr. Sonia Girgis, a physical medicine and rehabilitation specialist, for evaluation of his chronic pain. Dr. Girgis noted that Holmes had a good range of motion in his shoulders and cervical and lumbar spine, and that his reflexes were symmetrical and sensation intact. Dr. Girgis diagnosed Holmes with myofascial pain, chronic fatigue syndrome, and osteoarthritis. Dr. Girgis prescribed him medication and recommended continuing

5

physical therapy. In January and May, 2006, Dr. Girgis opined that Holmes had chronic neck pain secondary to degenerative changes and radicular pain.

In August, 2006, Holmes went to the emergency room complaining of chronic neck pain and dizziness. He reported that he had "doubled up" on his pain medication and drank three beers to try to relieve the pain. [R. at 249]. He was given pain medication and instructed to follow up with his doctor.

In October, 2006, Dr. Stephen J. Farber, a rheumatologist, evaluated Holmes. Dr. Farber noted that Holmes's hands, posterior shoulder area, elbows, knees and hips were tender. On examination, Dr. Farber found no definite swelling in the hands, but stated there was a mild sense of fullness. He noted minimal degenerative changes in Holmes's peripheral joints. Dr. Farber preliminarily diagnosed Holmes with secondary fibromyalgia with an underlying disease. Dr. Farber opined that Holmes's difficulty tolerating certain medications could be due to his fibromyalgia.

Later that month, after laboratory studies ruled out an underlying inflammatory disease, Dr. Farber diagnosed Holmes with primary fibromyalgia and recommended Holmes return to Dr. Miller for treatment.

On April 29, 2007, Dr. Miller wrote a letter to Holmes's counsel, summarizing the various treatments Holmes received and concluding that Holmes was not capable of full-time employment. In a separate form, Dr. Miller indicated that Holmes could not perform any work on a sustained basis, bend, twist, squat, kneel, or climb ladders or scaffolding, and could only occasionally reach above shoulder level or climb stairs. He noted that Holmes would have difficulty using his hands for pushing or pulling and fine manipulation.

### III. Testimony

Holmes testified that he hit his head on the bottom of a swimming pool twenty-five years ago. He testified that he had degenerative arthritis or osteoarthritis, primary fibromyalgia, headaches, fatigue, carpal tunnel syndrome, and lower back and joint problems.

Holmes estimated that he could walk for no more than twenty minutes, sit for no more than fifteen-to-twenty minutes, and stand for five minutes. He explained that he could not lift any amount without pain.

Holmes testified that he takes pain pills, which make him groggy, as well as Cymbalta for depression and neuropathy in his hands.

Holmes testified that he is usually able to take care of himself at home and can do light housework, but that his wife cuts the grass and shovels the snow. He stated that he can vacuum, but that he will vacuum one-half of the house and then rest before doing the other half.

He testified that he did not have a history of substance abuse and that he now "[has] an occasional beer and that's about it." [R. at 307]. When asked if there was a time when he drank heavily, he responded, "I wouldn't call it heavily, but it calmed me down." *Id.*

### Standard for Disability

To determine disability, the ALJ engages in a sequential, five-step evaluative process. 20 C.F.R. § 404.1520. The ALJ considers whether: 1) the claimant is engaged in work that constitutes substantial gainful activity; 2) the claimant is severely impaired; 3) the claimant's impairment meets or equals the Secretary's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App. 1; 4) claimant can perform past relevant work; and 5) other jobs exist in significant numbers to accommodate claimant if claimant cannot perform his past relevant work, given his residual functional capacity

(RFC), age, education and past work experience. *Id*. The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *Id.* at § 404.1520(a)(4). The claimant must provide evidence of functional limitations, not simply diagnosis of an impairment. 20 C.F.R. § 404.1512(c).

## ALJ Findings

The ALJ found that, in sum, [R. at 18-23]:

1) Holmes met the insured status requirements of the SSA through December 31, 2008;

2) Holmes had not engaged in substantial gainful activity at any time relevant to this decision;

3) Holmes had impairments that at least in combination are severe: degenerative disc disease, fibromyalgia, osteoarthritis, anxiety, and a history of alcohol abuse;

4) Holmes had impairments that do not meet or medically equal any impairment listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526);

5) Holmes had the RFC to perform medium unskilled work not requiring more than occasional crawling or climbing ladders, ropes, scaffolds, or sustained repetitive use of the hands for reaching including overhead;

6) Holmes was unable to perform past relevant work;

7) Holmes was a "younger individual" at the time of his alleged onset of disability, and is now "an individual closely approaching advanced age";

8) Holmes had at least a high school education and is able to communicate in English;

9) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules provide a framework for concluding that Holmes was not disabled, whether or not he has transferable job skills;

10) there are jobs in the national economy that Holmes can perform;

8

11) Holmes was not under a "disability" as defined by the SSA from November 18, 2003, through June 6, 2007.

**Standard of Review**

When reviewing the Magistrate's Report, I make a *de novo* determination regarding the portions to which Holmes objects. *See* 28 U.S.C. § 636(b)(1).

In reviewing the Commissioner's decision, I must determine whether substantial evidence supports the ALJ's findings, and whether the ALJ applied the proper legal standards. 42 U.S.C. § 405(g); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). I "may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If substantial evidence supports it, I must affirm the ALJ's decision, even if I would have decided the matter differently. 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brainard*, *supra*, 889 F.2d at 681 (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence supports the ALJ's findings, I view the record as a whole, *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.1980), and consider anything in the record suggesting otherwise. *See Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978).

**Discussion**

Holmes objects to the Magistrate's findings that the ALJ appropriately evaluated: 1) the opinion of Holmes's treating physician; 2) the state agency physicians' opinions; and 3) Holmes's credibility.

**I. Medical Opinion Evidence**

Holmes argues that the ALJ erred by rejecting his treating physician's opinion, and by relying on the opinions of two state agency, non-examining physicians whose review of Holmes's medical records occurred before he was diagnosed with carpal tunnel syndrome and fibromyalgia.

**A. Treating Physician**

Holmes first objects to the Magistrate's finding that the ALJ adequately addressed Dr. Miller's opinion. He argues specifically that the Magistrate incorrectly determined that the ALJ: 1) did not reject Dr. Miller's opinion; and 2) adequately articulated reasons for giving less weight to Dr. Miller's opinion.

The opinions of treating physicians[2] are entitled to greater weight than that given to other medical care providers in Social Security cases. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* SSR 96-2p (1996). Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albiet a rebuttable

---

[2] Social Security regulations distinguish between different types of medical sources. A "treating source" is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you with medical treatment or evaluation, and who has, or had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. A "nonexamining source" is a medical source "who has not examined you but provides a medical or other opinion in your case." *Id.* A "nontreating source" is a medical source "who has examined you but does not have, or did not have, an ongoing treatment relationship with you." *Id.*

10

one, that the opinion of a treating physician is entitled to great deference." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).

The ALJ must give the treating physician's opinion controlling weight if he finds the opinion "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

Before he refuses to give a treating source controlling weight, he must consider certain factors—"namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion." *Wilson*, *supra*, 378 F.3d at 544 (citing 20 C.F.R. § 414.1527(d)(2)).

It is sufficient for an ALJ to state that a treating physician's opinion is: 1) "inconsistent with the overall evidence of record;" and 2) based solely on the claimant's "reporting of her symptoms and her conditions" which the ALJ found not to be credible. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007).

A conclusory medical opinion is not entitled to controlling weight. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." (internal citation and quotation omitted)). The ALJ also need not defer to a physician's determination of whether or not a claimant is disabled. *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

A treating physician's opinion that is not given controlling weight is not necessarily rejected. *See Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993) ("This court has consistently stated that

the [Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").

An ALJ must provide "good reasons" for the amount of weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2). These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. Failure to provide such reasons "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, *supra*, 486 F.3d at 243.

Here, Holmes argues that the ALJ "effectively rejected" treating physician Dr. Miller's[3] opinion without providing "sufficiently specific" reasons for that rejection. [Doc. 21, at 3]. Holmes also argues that the ALJ incorrectly determined that Dr. Miller's opinion relied on Holmes's subjective report of symptoms.

Dr. Miller's opinion consists of a slightly longer than one-page letter. [R. at 172-73]. It primarily summarizes treatment provided by physicians to whom Dr. Miller referred Holmes for consultations and concludes:

> This letter is really the briefest of summaries; copies of the consults and multiple image modality reports are enclosed as well. As you can see, Mr. Holmes has had much independent verification of his ongoing pain syndromes, which include diffused degenerative joint disease focusing on the shoulders, neck, and hands, along with fibromyalgia, radicular pain, and chronic carpal tunnel syndrome. A multitude of medications have been minimally successful in controlling the pain level, and none have improved his functional level. As a result, I do not believe he is physically capable of gainful full-time employment.

---

[3] There is no dispute that Dr. Miller is a treating physician.

12

[R. at 173].

The only other record from Dr. Miller is a Residual Physical Capacities Questionnaire in which Dr. Miller indicates that Holmes: 1) could sit or stand for two hours, walk for four hours, or alternatively sit and stand for three hours a day; 2) could lift and carry ten to twenty pounds occasionally; 3) could not use his hands for pushing and pulling or fine manipulation; and 4) could not perform sedentary or light work "on a sustained basis." [R. at 174].

The ALJ stated:

I have considered Dr. Miller's opinion that the claimant is incapable of sustaining full-time employment due to a plethora of exertional and nonexertional limitations which the vocational expert testified would preclude all work. Dr. Miller's opinion is quite conclusory and appears to have relied quite heavily on the subjective report of symptoms and limitations provided by claimant, and seemed to uncritically accept as true most, if not all, of what claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of claimant's subjective complaints, as well as his compliance with treatment recommendations and use of medications.

[R. at 22].

Neither Dr. Miller's letter nor the questionnaire provide any basis for the ALJ to conclude that the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" as required for the ALJ to give the treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(d)(2).

First, the Magistrate correctly found that the ALJ did not "reject" Dr. Miller's opinion, but rather gave it less than controlling weight. As opposed to "summary dismissal" of a treating physician, see *Wilson*, *supra*, 378 F.3d at 545, the ALJ here considered Dr. Miller's opinion, and gave reasons for discounting it: 1) the opinion is conclusory, and 2) the opinion "appears to have relied heavily" on Holmes's subjective reports of symptoms.

13

The ALJ was not required to give Dr. Miller's conclusory opinion controlling weight. *Buxton*, *supra*, 246 F.3d at 773.

Second, Holmes's argument that "[t]he ALJ did not give any indication that Dr. Miller had relied on the reports of other physicians" is unavailing. [Doc. 21, at 4]. The ALJ stated that Dr. Miller's opinion "appears to have relied quite heavily on the subjective report of symptoms and limitations provided by claimant, and seemed to uncritically accept as true, most, if not all, of what claimant reported." [R. at 22].

The bulk of Dr. Miller's letter summarizes treatment other physicians provided to Holmes. A review of the records of the physicians referenced in Dr. Miller's letter (Drs. Calderon, Skie, Hoeflinger, Finkel, James, Swimmer, Hui, Girgis and Farber) indicates that those physicians based their diagnoses substantially on Holmes's subjective descriptions of his symptoms. Finally, Holmes submitted no independent treatment records from Dr. Miller to support his conclusions. The ALJ's statement that Dr. Miller's opinion relied on Holmes's subjective reporting of his symptoms, is thus supported by substantial evidence in the record.

Holmes cites *Hensley v. Astrue*, 573 F.3d 263, 266-67 (6th Cir. 2009) in support of his claim. Unlike *Hensley*, the ALJ here did not simply reject the treating physician's opinion in favor of a non-treating physician's contrary opinion. The ALJ gave sufficiently specific reasons for discounting Dr. Miller's conclusions about Holmes's capacity for work.

Third, with regard to Holmes's capacity for work, the ALJ was not required to defer to Dr. Miller's opinion that Holmes could not work. *See Bass*, *supra*, 499 F.3d at 511; 20 C.F.R. § 404.1527(e)(2) (stating that "the final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner"); SSR 96-5p (describing issues reserved for Commissioner's determination).

14

While Holmes is correct that "the Commissioner does not have unfettered discretion in how it reaches this conclusion," [Doc. 21, at 4], as discussed below, the ALJ here thoroughly considered relevant evidence and arrived at an RFC determination.

Finally, as the ALJ references, and discusses elsewhere in his opinion, the ALJ found that Holmes was not entirely credible. Because the ALJ found Holmes not credible, he could reasonably attribute less weight to Dr. Miller's opinion when he found that Dr. Miller's opinion was based in large part on Holmes's subjective report of symptoms.

The ALJ's gave sufficiently specific reasons for his decision to give little weight to Dr. Miller's opinion. *See Smith*, *supra*, 482 F.3d at 877; 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. The ALJ's decision is thus supported by substantial evidence.

### B. Non-Examining Physicians

Contrary to the Magistrate's determination, Holmes argues that the ALJ erred in relying on state agency physicians' opinions when determining Holmes's residual functional capacity (RFC).[4] Holmes argues specifically that the state agency physicians did not have evidence of his fibromyalgia or carpal tunnel syndrome when they reviewed his file, and therefore the ALJ's decision is not supported by substantial evidence.

When determining a claimant's RFC, the ALJ must "consider all [claimant's] symptoms, including pain, and the extent to which [claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); *see also* SSR 96-3p.

---

[4] A social security disability claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).

15

While an ALJ may not express a medical opinion himself, he need not adopt any one physician's medical opinion verbatim in assessing a claimant's RFC. 20 C.F.R. § 404.1545(a)(1) (stating that the entity determining RFC must do so "based on all the relevant evidence in [the claimant's] case record"). Responsibility for assessing RFC rests with the ALJ. *Id.* at § 404.1546(c); *see also Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 647 (6th Cir. 2006) (unpublished disposition).

Social Security Ruling 96-6p provides:

> [T]he opinions of State agency medical . . . consultants . . . can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency.

The ALJ here conducted a thorough analysis of the evidence and determined that Holmes had an RFC "to perform medium unskilled work not requiring more than occasional crawling or climbing ladders, ropes, scaffolds, or sustained repetitive use of the hands for reaching including overhead." [R. at 18].

Holmes argues specifically that the ALJ erred in relying on reports from two state agency physicians, Drs. Derrow and Liepack, because they did not have evidence of his carpal tunnel syndrome or fibromyalgia. Holmes is correct that the reviewing physicians did not consider these two diagnoses, because they had not yet been made.

He alleges further that the Magistrate erred in finding that, because the ALJ acknowledged these two diagnoses, he must have considered them. Holmes argues that the ALJ "essentially substituted his own lay opinion for that of the medical expert." [Doc. 21, at 6].

16

Although the state agency physicians did not have evidence of Holmes's later diagnoses, the ALJ did not rely exclusively on their reports. He stated that the reports "deserve some weight, particularly in a case like this where there exist a number of other reasons to reach similar conclusions." [R. at 21].

Although the state agency physicians did not have the benefit of Holmes's carpal tunnel or fibromyalgia diagnoses, the ALJ considered both diagnoses in determining Holmes's RFC. The ALJ referenced both Dr. Farber's October, 2006, fibromyalgia diagnosis and the "May 2006 EMG  .  .  . consistent with bilateral carpal tunnel syndrome." [R. at 20]. The ALJ expressly noted that carpal tunnel syndrome "is accommodated in the residual functional capacity reached in this decision." *Id.*

While Holmes argues that Dr. Miller was "the only physician who addressed the limitations imposed by the fibromyalgia," [Doc. 21, at 6], Dr. Miller did not tie any particular finding to fibromyalgia, nor did Dr. Farber, the physician who diagnosed Holmes's fibromyalgia, describe the limitations imposed because of the diagnosis. As discussed above, the ALJ provided adequate reasons for discounting Dr. Miller's conclusory opinion.

Finally, the ALJ noted that there were gaps in time where Holmes sought no medical treatment and took no pain medication. [R. at 20 ("[W]hen claimant returned to Dr. James in February 2004 for pain management after a 20-month treatment gap, he was on no prescription pain medication."); 21 ("In sum, the record does not show a *use of medications, pursuit of treatment*, or activities of daily living that are consistent with totally disabling impairments.") (emphasis added)].

As discussed below, the ALJ also considered Holmes's own testimony, and gave reasons for why he found it not fully credible. Other than Dr. Miller's testimony, which, as discussed above, the

ALJ properly discounted, Holmes points to nothing else to support his claim that he had greater limitations than the ALJ determined.

I therefore find that the ALJ did not err in considering the state agency physicians' reports and that the ALJ's RFC determination is supported by substantial evidence.

## II. Credibility

Holmes argues that, contrary to the Magistrate's decision, the ALJ erred in evaluating Holmes's credibility.

Holmes specifically argues that the ALJ erred in his credibility analysis by: 1) improperly relying on objective medical examinations in light of Holmes's fibromyalgia diagnosis; 2) improperly considering Holmes's alcohol use in relationship to his fibromyalgia; 3) failing to explicitly consider all seven factors listed in 20 C.F.R. § 404.1529(c)(3) in evaluating Holmes's pain complaints; 4) failing to consider Holmes's difficulty tolerating medication; 5) failing to "consider the totality of the multiple specialists that Mr. Holmes consulted in an effort to find answers to his pain," [Doc. 21, at 4]; and 6) failing to specify what daily living activities were inconsistent with Holmes's description of his pain.

On review, I am "to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). In reviewing an ALJ's credibility determination, I am "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Id.*

18

The ALJ's reasons "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for the weight" in making a credibility determination. SSR 96-7p. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* An individual's statements may be less credible if "the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment prescribed and there are no good reasons for this failure." *Id.*

The ALJ must consider all of a claimant's symptoms, including pain. 20 C.F.R. § 404.1529(a). This includes the claimant's own statements about his pain and other symptoms, in addition to the effect those symptoms have on the claimants daily activities and ability to work. *Id.* In making this determination, the ALJ evaluates the claimant's credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)

### A. Subjective Complaints of Pain

Subjective complaints of pain are evaluated under the two-part test articulated by *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852-53 (6th Cir. 1986). The ALJ must first determine "whether there is objective medical evidence of an underlying medical condition." *Id.* at 853. If so, the ALJ must then determine "whether objective medical evidence confirms the severity of the alleged pain arising from the condition or whether the objectively established medical condition is of such a severity that it can be reasonably expected to produce the alleged disabling pain." *Id.*; *see also* SSR 96-7p.

19

In evaluating subjective complaints of pain, an ALJ may properly consider a claimant's credibility. *Walters*, *supra*, 127 F.3d at 531.

Fibromyalgia is an unusual impairment in that its symptoms are often not supported by objective medical evidence. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) ("[G]iven the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important.").

The Sixth Circuit has also noted, however, that "a *diagnosis* of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (unpublished disposition). The court in *Vance* stated: "'Some people may have a severe case of fibromyalgia as to be totally disabled from working  .  .  .  but most do not and the question is whether [claimant] is one of the minority.'" *Id.* at 806 (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

Here, the ALJ first found that Holmes's "medically determinable impairments could reasonably be expected to produce the alleged symptoms but that his statements concerning the intensity, persistence and limiting effects of symptoms are not credible." [R. at 20].

The ALJ pointed to two inconsistencies supporting his credibility determination between: 1) Holmes's testimony about his alcohol use, and what he told his doctors about his alcohol use; and 2) Holmes's testimony and the medical record.

20

## 1. Alcohol Use

With regard to alcohol use, the ALJ pointed to Holmes's inconsistent statements to explain his finding that "the record contains blatant inconsistencies by claimant which cast a dark shadow over his overall veracity." [R. at 20].

At the ALJ hearing, Holmes testified that he did not have an alcohol problem:

Q: You have a history of substance abuse?

A: No, that is something I'm embarrassed about, but it took them five years to diagnose me and it was terrible and I slipped into depression and didn't know what else to do. So now it's an occasional—I have an occasional beer and that's about it.

Q: And was there a time you were drinking heavily?

A: I wouldn't call it heavily, but it calmed me down.

*Id.* at 307.

The ALJ noted, however, that contrary to these statements, Holmes

report[ed] daily beer drinking of a six pack in March 2002  .  .  . , a 12 pack in March 2004  .  .  . , and eight to ten beers in June 2004  .  .  .  and September 2004, when the claimant reported worsening alcoholism during the previous year assertedly to alleviate pain.  .   .   .   An October 2006 note indicates that he as drinking six or seven beers every day.

*Id.* at 21.

The ALJ also noted that Holmes "at times failed to take prescribed medications because of his heavy daily drinking" and did not follow up on physicians' recommendations to stop drinking. *Id.*

The ALJ thus appropriately considered Holmes's alcohol use to the extent relevant to his credibility and medical treatment. *See* SSR 96-7p (noting that failure to follow prescribed treatment may cast doubt on credibility). The ALJ was therefore not, as Holmes contends, "swayed by Mr.

21

Holmes's alcohol use," [Doc. 21, at 8],[5] but rather considered it as it weighed on Holmes's overall credibility. SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

## 2. Consideration of Objective Medical Evidence

With regard to medical record inconsistencies, the ALJ noted:

> For example, the claimant testified to marked orthopedic problems, although on March 18, 2002 he denied numbness and weakness in his arms and legs and on December 12, 2005 he had 5/5 motor strength in his upper and lower extremities . . . Further, while an MRI of claimant's cervical spine showed degenerative changes at multiple levels with mild to moderate narrowing of the neuroformina, physical examination showed good range of motion of the cervical spine, a negative Spurling test, and a 5/5 motor examination of all extremities.

[R. at 20 (internal record citations omitted)].

The ALJ did not, as Holmes asserts, consider these medical findings as a counter to Holmes's fibromyalgia diagnosis, but rather, as part of the overall RFC determination. The ALJ found that Holmes had impairments that at least in combination are severe, including: "degenerative disc disease, fibromyalgia, osteoarthritis, anxiety, and a history of alcohol abuse." [R. at 18]. The ALJ properly considered objective medical evidence given the degenerative disc disease and osteoarthritis diagnoses.

## 3. Evaluation of Regulatory Factors

In evaluating allegations of pain, additionally, an ALJ is to consider factors including: 1) daily activities; 2) location, duration, frequency and intensity of pain or other symptoms; 3)

---

[5] Holmes correctly notes that the ALJ did not suggest that alcohol is a contributing factor material to the issue of disability under 20 C.F.R. § 404.1535(b)(2). Rather, the ALJ proeprly considered Holmes's inconsistent statements about his alcohol use in evaluating Holmes's credibility. *See* SSR 96-7p (noting the statement consistency is relevant to credibility).

precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medication; 5) treatment, other than medication; 6) other measures used to relieve pain; and 7) other factors relating to functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3).[6]

Holmes also argues that the ALJ improperly assessed his credibility regarding his symptoms by considering only three of the seven factors listed in 20 C.F.R. § 404.1529(c)(3). This is contrary to the Magistrate's determination that the ALJ considered six of seven.

The ALJ evaluated Holmes's daily activities: "He says that he does light housework, cooking, repair, gardening, and pet care chores and that his wife has cut the grass and shoveled snow for four years." [R. at 19].[7]

The ALJ also discussed Holmes's description of his pain as reported by physicians, and by Holmes's own testimony. The ALJ also discussed Holmes's medications and their side effects, noting that Holmes "testified that his medications make him groggy and tired," and that "after a 20-month treatment gap, [Holmes] was on no prescription pain medication" in February, 2004. *Id.* at 19-20.

Finally, the ALJ discussed Holmes's various treatments including physical therapy, chiropractic care and medications.

The fact that the ALJ did not "include a factor-by-factor discussion does not render his analysis invalid." *Storey*, *supra*, 181 F.3d 104. Based on my review of the record, I find that the ALJ

---

[6] An ALJ's failure to "include a factor-by-factor discussion does not render his analysis invalid." *Storey v. Comm'r of Soc. Sec.*, 181 F.3d 104 (6th Cir. 1999) (unpublished disposition); *see also Hillman v. Barnhart*, 170 F. App'x 909, 913 (5th Cir. 2006) (upholding ALJ ruling, even thought ALJ did not explicitly address each regulatory factor for claimant's alleged disabling pain).

[7] This description of Holmes's daily activities is supported in the record by Holmes's disability application and testimony.

in this case set forth the appropriate standard, [see R. at 19] and provided reasons "supported by evidence in the case record . . . sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for the weight." SSR 96-7p.

The ALJ found, based on the inconsistencies in the record noted above, the Holmes was not entirely credible. This decision is "reasonable and supported by substantial evidence in the record" and I therefore defer to it. *Jones*, *supra*, 336 F.3d at 476; *see also* SSR 96-7p (noting that inconsistent statements may cast doubt on credibility).

### B. Difficulty Tolerating Medication

Holmes next argues that the ALJ did not consider Dr. Farber's conclusion that Holmes's fibromyalgia interfered with his ability to tolerate anti-inflammatory medications. Dr. Farber's finding, however, contradicts other physicians' findings that Holmes's alcohol consumption contributed to his inability to tolerate medications. *See* R. at 204, 214. It is the ALJ's responsibility, not mine, to resolve such conflicts in the evidence. *Cutlip*, *supra*, 25 F.3d at 286.

### C. Consideration of Multiple Specialists

Holmes argues that the ALJ "gave no consideration to the totality of medical resources Mr. Holmes sought to relieve his pain." [Doc. 21, at 10]. The ALJ, however, thoroughly considered the objective medical evidence, the diagnoses given by many physicians, and Holmes's subjective description of his pain and limitations. I find that the ALJ adequately considered the record as a whole in reaching his decision.[8]

---

[8] Holmes argues that the ALJ "does not cite to any evidence" in support of his conclusion that "the record does not show a use of medications, pursuit of treatment, or activities of daily living that are consistent with totally disabling impairments." [Doc. 21, at 9] The ALJ, however, did

I therefore conclude that the ALJ applied the correct legal standards, and that the ALJ's credibility determination is supported by substantial evidence in the record. Holmes's objections to the Magistrate's Report are thus overruled.

<div align="center">**Conclusion**</div>

ORDERED THAT plaintiff's objections to the Report and Recommendation of the United States Magistrate Judge be, and the same hereby are, overruled.

So ordered.

<div style="margin-left:40%">
s/James G. Carr                Date:March 26, 2010
James G. Carr
Chief Judge
</div>

---

precisely that: he evaluated the medical evidence and Holmes's testimony in the paragraphs immediately preceding this statement.